CHABERT, PETITIONER AND APPELLANT, *v.* SÁNCHEZ, RESPONDENT AND APPELLEE.

APPEAL from the District Court of San Juan in a Habeas Corpus Proceeding.

No. 2197.—Decided March 28, 1921.

HABEAS CORPUS—PATRIA POTESTAS—WELFARE OF MINOR.—Although fathers are generally entitled to the custody of their minor children, that right is not absolute and a petition for a writ of habeas corpus to obtain the custody of

a minor child, which is by its nature an equitable remedy, is directed to the sound discretion of the court within which the principal factor to be considered is the welfare of the minor.

The facts are stated in the opinion.

Mr. M. Acosta for the appellant.

Mr. E. Acuña for the appellee.

MR. JUSTICE HUTCHISON delivered the opinion of the court.

Petitioner appeals from an adverse judgment in habeas corpus proceedings for the custody of a child six years old at the time of the trial.

For the purposes of this opinion it will suffice to quote from the statement of the trial judge the following:

"It cannot be denied that the court is confronted with a grave and complex problem. There is no doubt that the case is a sensational one of unusual aspects. If the judge upon whom devolves the decision thereof should be swayed by the wave of popular opinion rather than by his fear of God and the dictates of his conscience, his position, placed between the opposing strong currents of diverse and adverse views, which, although unable to overcome his conscientious scruples, necessarily reached his knowledge, since a judge is not a rock in the ocean impervious to the action of the waves and blind to the light of the sun, would be extremely embarrassing. The only qualification demanded of a judge is that he shall never allow his opinion to be deviated, his judgment turned from the paths of duty, by the influence of another's opinion or by passion, prejudice or fear; and the trier of this case is secure in his conviction that his mind is absolutely free of all passion, fear, or timidity. His desire is to go to the bottom, to the essence of the case before him, for he believes that judges are not mere instruments for the application of precepts. But he wishes, as is his duty, to be sure that his decision is fair and absolutely impartial.

"On the one hand a petitioner alleges that he is the father of a little girl who is deprived of her liberty and unlawfully under the custody of another person. This man says that this child was born one month after his marriage; that at its birth both he and his wife sought to avoid public criticism and so delivered the child to an old female servant and that later, desiring to recover the child even in the face of such criticism, they are compelled to seek the aid of the courts. If we give credence to the foregoing, we are constrained to

admit that the abandonment of a child to avoid public criticism is appalling and does not speak in favor of its progenitor, since he places self-love and fear of public criticism above his affection for his child. Such act shows a subversion of sentiment, an undue estimate, perhaps, of the importance of public criticism and involves the taking of a step essentially wicked to eliminate or diminish the effects of an error engendered by passion. But there is no fault that cannot be redeemed. Repentance based on sound moral and human sentiment eliminates or condones the omission, the same as when based on religious doctrine. If the evidence favors the petitioner and the law is on his side, his past error is no impediment to the delivery of his child to him.

"On the other hand here is a man who, in company with his noble spouse, has performed a great act of charity, who has taken into his home a sick, abandoned and helpless child, who has supported and cared for her, watching over her sleep with all the disinterested affection of a father, who has acquired an immense and deep-rooted love for the little one who providentially came into his keeping, in which love his wife participates, and who is now almost suddenly asked to relinquish what has become a part of his being and existence. And this man asserts that he does not know that the one who claims the child is her father and refuses to part with her until convinced that he who claims her possesses in law a better right than he himself has to her custody.

"The matter of the custody is in point of fact reduced to two elements:

"1. Has the petitioner proved that he is the father of the child now in the custody of Felipe Sánchez Osorio and that such child is the one recorded in the Civil Registry of Río Grande under the name of Nancy Aida Chabert y Ojeda?

"2. Has it been proved that Felipe Sánchez Osorio is unlawfully detaining the petitioner's or any other person's child in his custody?

"As to the first point the petitioner must submit enough evidence to convince the court that the child whom Sánchez Osorio has brought before it is his child. If the fact had been admitted and accepted, the law in the case would be so simple that any layman would unhesitatingly apply it. In such a case the law must take precedence over all sentiment. Such is the accepted theory and nothing would remain but to deliver the minor to the lawful father, who, according to the code, is entitled to its custody. But since this basic and fundamental fact has been impugned, the court must proceed with all

care to examine the evidence and should require satisfactory proof looking to the identity of the child and to the status of father which the petitioner claims to possess.   \*   \*   \*

"The identity of the child is the most complex question involved and perhaps requires the clearest and most convincing proof. If Aida or Aida Milagros, as Rosalía González calls her, is the same Nancy Aida Chabert recorded in the Registry in 1919 by Augusto de Chabert, this fact should be supported by the most satisfying evidence and the court finds that it is one of the points that has not been proved. We require clear and positive proof that will carry to the mind of the court the conviction that in delivering the child to the petitioner the court is delivering something which belongs to him, to which he is entitled. In the absence of other evidence that might perhaps be presented by the petitioner himself, the nearest that has been submitted at the trial is that of Rosalía González, and that is adverse to the petitioner. It is manifest to the court that this witness, even in the face of the severest cross-examination, maintained her position under a shower of adroitly put questions in a most remarkable manner and with astonishing assurance. It is true that she went to see Attorney Gaetán Barbosa, although she wavered and even denied this fact. We do not know what she may have told him, but in any event she has testified under oath that she did not know the person who called for her that evening, that she did not know the petitioner Chabert as the father of the child, and that she never had any dealings with him as such father; that she was told by a business broker that she ought to recover her expenses and that the broker said that she knew who was the father of the child, but we find no evidence that she knew and that she answered him that it was a certain person.

"It has been contended in the argument that this witness testified falsely. In view of what the judge saw and heard at the trial of this case he is unable to participate in such belief. If the court were justified in supporting such contention his decision and his decree would be as conclusive as severe. But in the absence of any ground for such contention the court cannot and should not disregard the testimony of Rosalía González, arbitrarily striking the same.

"If the trier of this case were sufficiently convinced that the petitioner is the father of the child in the custody of Felipe Sánchez Osorio and that the child is really Nancy Aida Chabert y Ojeda, no human power could prevent his turning over the child to the petitioner. But in the absence of such conviction this is not relevant.

The petitioner may be able later to introduce sufficient evidence and attain his purpose, but with the evidence now before it the court is of the opinion that it would not be justified in granting the prayer of the complaint.

"If Sánchez Osorio has in his custody a child that was delivered to him by Rosalía González, who, in turn, received it from a person whose name she does not divulge, and if no demand has been made upon Sánchez Osorio by one adducing proof that he is the father and has a better right to its custody and care, it necessarily follows that the child is not unlawfully detained by Sánchez Osorio, but is at present lawfully in his possession and custody. This being the case, until the law and the evidence show the existence of a claimant having such better right, the court cannot favorably consider the claim of the petitioner.

"The judge is ignorant as to whether this decision meets the demands of justice as fully as he has fervently and ardently desired. He knows that he has conscientiously exercised the entire force of his mind in probing the true facts of the case and that his decision is in accord with the dictates of a conscience purged of all passion and prejudice and with a conviction engendered by the evidence submitted in the case. When the original circumstances are obscure and surrounded by enigma, it is incumbent upon the judge to demand that light be thrown upon such obscurity and that the clouds of mystery be dispersed in order properly to decide a petition such as the present one."

The foregoing extract makes several things at once self-evident. The trial judge was keenly alive to the aroused state of public opinion and was painfully conscious of the fact that his decision would become the target of more or less adverse criticism. He also understood that, the identity of the child once established, the right of the father would be absolute, the hands of justice would be hopelessly bound by the letter of the law, and the conscience of the court would be paralyzed and powerless to act in the face of a stern *stare decisis.* Indeed, it is difficult to avoid the conclusion that the alleged failure to establish paternity was seized as the only available means of reaching a just and equitable result. That in the face of these imaginary diffi-

culties relief was denied, apparently upon the principle of *fiat justitia, ruat coelum*, bears eloquent testimony to the sense of justice and singleness of purpose that survived such a test.

The misapprehension of the court below as to the absolute character of the right asserted by the father and as to the total absence of any judicial power or discretion to inquire into or determine any question beyond that of paternity, if it did not restrict the scope of the investigation, unquestionably precluded due consideration of the more important facts disclosed by the applicant as well as by witnesses for the respondent and not even mentioned by the trial judge in summing up the testimony.

"The ascertainment and enforcement of the custody of minor children by the use of the writ of habeas corpus is of an equitable nature, and in such cases the question of personal freedom is not involved, for an infant, from humane and obvious reasons, is presumed to be in the custody of someone until it has attained its majority, and the court, when asked to restore an infant, is not bound by any mere legal right of parent or guardian, but is to give it due weight as a claim founded on human nature, and generally equitable and just. Therefore these cases are not decided upon the legal right of the petitioner to be relieved from unlawful imprisonment or detention, as in the case of an adult, but upon the court's view of the best interests of those whose welfare requires that they be in custody of one person or another; and hence a court is in no case bound to deliver a child into the custody of any claimant or of any person, but should, in the exercise of a sound judicial discretion after a careful consideration of the facts, leave it in such custody as the welfare of the child at the time appears to require. Accordingly, although a father is ordinarily entitled to the custody of his minor children, and upon habeas corpus, courts have the power to award it to him, still the application is addressed to the discretion of the court, and such custody may be withheld from the father when it is made clearly to appear that by reason of his unfitness for the trust, or of other sufficient causes, the permanent interests of the child would be sacrificed by a change of custody." 12 R. C. L. 1215, section 34.

"An instructive opinion by Judge Betts delivered in the case of *In re Berry,* U. S. Circuit Court for the Southern District of New York," appended to the case of *In re Burrus,* 136 U. S. 586, and printed by request of the court, is again quoted with approval in *New York Foundling Hospital* . v. *Gatti,* 203 U. S. 429, the final paragraph of the extract, at page 439, reading as follows:

"The authority to take cognizance of the detention of infants by private persons, not held under claim, or color, or warrant of law, rests solely in England on the common law. It is one of the eminent prerogatives of the crown, which implies in the monarch the guardianship of infants paramount to that of their natural parents. The royal prerogative, at first exercised personally *ad libitum* by the King (12 Pet. 630), and afterwards, for his relief, by special officers, as the Lord High Constable, the Lord High Admiral and the Lord Chancellor, in process of time devolved upon the high courts of . equity and law, and in them this exalted one, of allowing and enforcing the writ of habeas corpus *ad subjiciendum,* became vested as an elementary branch of this jurisdiction. In the performance, however, of this high function in respect to the detention of infants by parents, etc., the court or judge still acts with submission to the original principle, out of which it sprang, that infants ought to be left where found, or be taken from that custody and transferred to some other, at the discretion of the prerogative guardian, and according to its opinion of their best interests and safety."

See also Church on Habeas Corpus, pages 696, 697, 698 and 700, sections 440, 441 and 442.

The case of *Le Hardy* v. *Acosta,* 18 P. R. R. 438, was not a habeas corpus proceeding, but a suit "brought by Le Hardy against the mother of his deceased wife to subject his children Philippe and Hilda, aged about four and three years, respectively, and who had been left by him temporarily in the care and custody of the defendant, to his authority as their father, enforcing the paternal authority (*patria potestas*) conceded by our Civil Code."

The only suggestion of a harsh attitude on the part of the petitioner in that case toward his children was contained

in the averment by the grandmother that it would amount to "excessively cruel treatment toward these children on the part of the plaintiff to take them away from the maternal care of the defendant in order to make them live in their new home under the conditions mentioned and at such a tender age."

The language used, as indicated in the opinion itself, should be read "in the light of the allegations made in the pleadings, the evidence adduced on the trial, and the law applicable to the facts." It does not hold that on an application for habeas corpus the same rule would apply. There was no necessity for holding that even in an action of the sort then under consideration a trial court would have no power to consider in any conceivable circumstances any matters whatsoever directly affecting the health, happiness or welfare of the children save only harsh treatment or corruptive influence, advice or example. Whatever *dicta* the opinion may contain that are susceptible of such an interpretation are not only wholly unsupported by any semblance of deliberate reasoning, but are shown by the facts above mentioned and by other statements made in the context not to have received the earnest consideration that the importance of the questions involved demands. The opinion to the extent indicated assumes without any very apparent reason that to render judgment against the plaintiff in an ordinary suit brought by a parent to recover possession, or to restore the custody of a child, is to deprive such parent of the *patria potestas,* or to suspend the exercise thereof. The existence of some correlative right may be conceded, but it does not follow that the difference between a proceeding to deprive a parent of his *patria potestas,* or to suspend the exercise thereof, and a resort by such parent to habeas corpus proceedings in order to recover the actual physical possession of a child out of his custody and control, is a mere distinction without a difference.

The reference to the *Ryan Case,* if not with approval of the consideration given by the Louisiana court to the future happiness and welfare of the child, at least without adverse comment on such attitude or effort to draw any distinction whatever as to the facts, is significant. It is expressly admitted that the *patria potestas* does not imply "the immediate right to the physical custody of the children on the part of the parent without reserve or conditions." It is also made plain "that the well-being of the children should be carefully guarded by the courts; but they should remember that the law has been enacted also with this point in view. 21 Cyc. 331, 332 and 333; *In re Gates,* 95 Cal. 461."

The text first cited in support of this proposition reads as follows:

"Other things being equal in the determination of the question of custody, the parents of the child will be preferred against third persons, including the grandparents and other relatives. In a contest between the parents, the father having the legal right to the children is in some instances to be preferred, but in others the mother, especially if the child is very young and so requires a mother's care or is illegitimate. The relatives of the child will usually be preferred as against a stranger, but not always, and generally the legal custody is the proper custody in the absence of exceptional circumstances."

The opinion of Mr. Chief Justice Beatty in the California case last above mentioned is brief and may be quoted in full:

"The petitioner, Margaret J. Olsen, a resident of Santa Clara County, is the mother of Della Gracie Gates, aged ten years and five months, who, the petitioner alleges, is unlawfully restrained of her liberty by James Eldridge at his residence in Lassen County. Said Eldridge admits that he has the custody of the child, and claims that he has a right thereto by virtue of an order of the superior court of Shasta County, appointing him her guardian.

"From the facts disclosed by the petition, the return, and the evidence adduced at the hearing, I am satisfied that the order ap-

pointing Mr. Eldridge guardian of the child is void for want of jurisdiction, and that the petitioner is the person legally entitled to her custody. But in view of special circumstances of the case, I do not feel called upon to make any coercive order by which the mere legal right of the petitioner may be enforced against the child's manifest inclination and reasonable choice to remain where she is. The petitioner voluntarily relinquished the care of her child when she was scarcely a year old, and ever since she was two years of age has left her in the exclusive charge and control of Mr. and Mrs. Eldridge, the latter being a sister of the child's father. The natural and inevitable consequence has been that this little girl, knowing no other parents or protectors, and never seeing her mother but twice in nearly nine years, has become deeply attached to her aunt and uncle, as they have to her, and has come to look upon her mother as a stranger. Though she has not reached the years of legal discretion, she is sufficiently intelligent to be trusted in some degree to choose in a matter affecting so deeply her feelings and her interests; and having examined her privately, I am convinced that it would be nothing less than an act of extreme cruelty to tear her from the only home she has ever known, even for the purpose of placing her under the care of her own mother. Her material interests also will be promoted by leaving her where she is, and where she chooses to remain. Her mother is without means to support her, except as they may be provided by her present husband, who, however willing he may be, is under no legal obligation to support a step-child and has but small ability to do so. Mr. and Mrs. Eldridge, on the contrary, have ample means and have no children of their own. They live in a healthy locality in the country, where all the surroundings are favorable to the moral and physical well-being of the child, and they have the disposition and ability to provide for her nurture, education and future comfort and security.

"Under these circumstances I consider that my duty in the premises is fulfilled by seeing that the child is freed from all illegal restraint, and leaving her free to go to the home of her choice.

"Writ discharged."

Such being the doctrine of the authorities cited in support of the conclusion reached in *Le Hardy v. Acosta,* and the subsequent decisions of this court being based on the *Le Hardy Case* without anything new in the way of argu-

ment, the question can hardly be regarded as *stare decisis*. On the contrary, it would seem reasonably safe to assume that if the facts in the *Le Hardy Case* had shown that the welfare of the children manifestly required a contrary decision, a different conclusion might have been reached without great difficulty as to the effect to be given in such circumstances to the provisions of section 236 of the Civil Code. But, in any event, the question involved herein has never been passed upon in this jurisdiction by a full bench in a habeas corpus proceeding.

The dissenting opinion of Mr. Chief Justice Hernández, in which the writer concurred, in *Arbona* v. *Torres,* 24 P. R. R. 423, which was likewise an ordinary action, not a habeas corpus proceeding, clearly distinguishes between the right to the *patria potestas* and the manner and conditions of its exercise. It is there pointed out that the *patria potestas* under our present law is not for the benefit of the father or the mother, but for that of the child which requires it. It is conclusively shown that such right is not absolute, but carries with it certain solemn duties and obligations, the gross neglect or abandonment of which may justify a court in refusing to restore to an unnatural parent the custody of a child. Speaking of the facts in that case, it was said "that the court in the exercise of its discretional power should ascertain and determine whether in a case like the present the father should be given the custody of the child so that he may comply with the parental duties imposed upon him by the *patria potestas,* or whether the mother should be allowed to retain it for that purpose."

Another paragraph of that opinion reads as follows:

"The Legislature has made no express provision for cases of dissolved illicit relations between a man and a woman during which natural children were born, and it seems to us to be contrary to common reason and equity that the mother of a natural child should be denied all rights during the life of the father who acknowledged

the offspring of such relations, and that the father who without cause deserts the woman who has borne him children should be allowed privileges which are denied to a man who begets children in lawful wedlock and abandons his lawful wife. Such a theory would lead to the absurd conclusion that a father, more unnatural than natural, has the right to tear his acknowledged child from the arms of its mother during the first days of its existence when it still requires nursing.''

And the final conclusion reached is thus stated:

''It is not possible to lay down as an absolute and inflexible principle that a natural child must live with the father who acknowledged it and exercises the right of *patria potestas* over it. The conditions of the exercise of that right should be regulated by the courts in accordance with the special circumstances of each case, always bearing in mind that the *patria potestas* under our present law is not for the benefit of the father or the mother, but for the benefit of the child which requires it.

''When the plaintiff sued for the custody of the child Rosa, it was only two and a half years of age, and, as is natural for a child of such tender years, still required the loving care and watchful solicitude of the mother who gave it birth. The child had always lived with its mother who naturally has more affection for it than the father. The father acknowledges the present morality of the mother. The lawful marriage of the father, already resulting in the birth of a child, must create difficulties of a moral character in the continuation of the relations of mother and daughter. In view of these special circumstances, the plaintiff should be denied the right to separate the child from its mother, in whose custody and under whose protection it should continue, without prejudice to a modification of that decision when warranted on reasonable grounds. The right of the father to the *patria potestas* would not be divested thereby in any essential particular.''

Neither section 236 nor any other section of the code ordains that nothing short of ''excessive harshness'' or other specified misconduct shall constitute an estoppel against a parent who invokes the aid of a court of justice in an equitable proceeding. But the same code that for the benefit of children vests in their parents the right of *patria potestas*

and prescribes the circumstances in which such parents may be deprived thereof by the courts, does provide, in its preliminary title which treats of laws, their effects and the general rules for their application, that "when there is no statute applicable to the case at issue, the court shall decide in accordance with equity, which means that natural justice, as embodied in the general principles of jurisprudence and in accepted usages and customs, shall be taken into consideration."

The *patria potestas* of the civil law is not so absolute as was the right of the common-law head of the family. Yet the British and American courts through years of persistent effort have succeeded in placing far above any correlative right to the custody of children the paramount public interest in the welfare of such offspring. And there is no very obvious reason why the fruits of the slow but steady progress made along these lines should not be reaped in this Island to-day as well as a century hence.

The courts of Louisiana have found in the Civil Law no insuperable obstacle to the adoption of the rule that obtains in other American courts.

The Supreme Court of that State has said that "the rule of the civil law in that respect does not differ from that in the common-law states." *State* v. *Trahan,* 125 La. 311.

In *State ex rel. Lasserre* v. *Mitchell,* 105 La. 741, it is pointed out that "the right of the community to superintend the education of its members, and disallow what, for its own security and welfare, it sees good to disallow, goes beyond the right and authority of the father."

From the same opinion we quote the following:

"The court is clothed with the power, with a sound discretion, to grant or refuse relief. The child itself, in contentions of this kind, is entitled to some measure of protection from the court. The parents, in issues of this kind, are not simply urging their own legal rights, but are acting for and on behalf of the child; and in

respect to this matter the state itself, as stated in the Bermudez case, has an interest which goes beyond the mere right and authority of either the father or mother. The right of neither is absolute. The right of either or both depends upon matters *in pais*, into which it is the object of the writ to have full inquiry, through an exhaustive examination under oath, so that the tribunal may have before it all the light practicable. We scarcely think that a writ of habeas corpus, directed to a woman touching the custody of a minor child, can be called a suit by the husband against the wife because the party invoking the state's action is a husband, and the party against whom the writ is directed is his wife, and the child is theirs. It is the result of a suggestion that the child is improperly restrained of its liberty, and that inquiry should be made into the facts of the case.''

In *State ex rel. Taylor* v. *Jones,* 113 La. 298, the court says:

''The child, under nature's laws, has some rights, not always to be overlooked. The parent's will is not always supreme. There may a case arise where exceptional features take it out of the grasp of the article of the Code invoked by relator.''

In *State* v. *Trahan, supra,* after pointing out, as we have already shown, that the principle underlying the provisions of the Civil Code is not inconsistent with the practice in the common-law states, the opinion proceeds:

''In passing upon the question of the welfare and the happiness of the child, the conduct of one or both of the parents towards her is a proper and legitimate factor in the determination of the same. If there be reason to think that the father's efforts to obtain the custody and care of the child are not on account of consideration by him for her well-being and happiness, but are referable to some motive other than this, the judge should not hesitate, but should leave the child where she has been found to be happy and satisfied and well cared for in every respect.

''Appellant's course of conduct has not been such as to impress us with the belief that he is acting in this matter from affection for the child or regard for her good and happiness. He has no word to say against the child's remaining where she is. He makes no complaint against the child's surroundings. We have no reason

to believe that they are not such as they should be.   The testimony
in the record negatives the allegations of the petition that the wife
spirited the child away and that she has concealed her whereabouts
from her father.

"We think, under the evidence, that the father knew, or could
have easily known, exactly where to find his child during all these
years, and that for some reason or other he did not care to take
any action in the premises.   We think the mother herself is entitled
to consideration under the circumstances of this case.   She has
faithfully performed, alone and unassisted by her husband, all her
duties in sickness and in health to the child for the last ten years.
Plaintiff's demand for the child is rested solely upon his naked,
absolute legal rights as father, and is presented to us under very
unfavorable circumstances.   That demand has been met by the
mother by way of a defense which we are of the opinion she had
a right to urge when the issue was raised.

"We think the trial judge properly refused to take the child
from her mother under the conditions shown."

And in *Ex parte Ryan,* 126 La. 455, distinguished on the
facts in the *Le Hardy Case* without disapproval of the doc-
trine announced, it is said that—

"These proceedings by habeas corpus can scarcely be regarded
as a suit between the relator and the defendant.

"It is a matter (as well said in *Lasserre* v. *Mitchel,* 105 La. 741,
30 South. 122, 54 L. R. A. 927) in which the state has an interest
which goes beyond the mere right and authority of the father.   The
welfare and happiness of the child have to be considered by the
court."

In view of the disposition to be made of this case we
prefer not to discuss the evidence in detail.

That petitioner is the father of the child now in the cus-
tody of defendant is not open to any reasonable doubt.   On
this point there is no question in the mind of any member
of this court.

But it has been suggested that the issue as to the best
interests of the child must be raised in the court below, and
in the decided cases as well as in the textbooks no doubt a

good deal has been said about questions of pleading including the matter of what constitutes a sufficient return.

Many if not most of the cases involving the custody of children, however, would seem to deal primarily if not exclusively with the principle underlying the evolution of this use of the writ, apparently without regard to technical points of pleading and practice; and if the welfare of the child be the paramount consideration, then the element of pleading may be regarded as a matter of comparatively minor importance.

Thus, in Church on Habeas Corpus, section 442, at page 702, we read:

"When an infant or minor is out of the possession and custody of the father, says Mr. Justice Stone, of the Supreme Court of Alabama, in a late case, and habeas corpus is resorted to by the latter to obtain such custody, it does not follow as necessary matter of right that the prayer of the petitioner will be granted. The court is clothed with a sound discretion to grant or refuse relief, always to be exercised for the benefit of the infant primarily, but not arbitrarily in disregard of the father's natural right to be preferred. If the father be reasonably suited, and able to maintain and rear his child, his prayer should ordinarily be granted. If, on the other hand, he is unsuitable or unable properly to care for his offspring, and especially if that offspring, having sufficient judgment, prefer not to return to him, the court should grant no relief in the premises, but leave the parties *in statu quo.* Unless it appears that the best interests of the child imperiously demand it, the court, says Holt, J., in *Green* v. *Campbell,* 35 W. Va. 698, 704, in dealing with relations so delicate, so easily set ajar irreparably, will follow the discreet course of letting well enough alone."

Much the same trend of thought appears to permeate the extract from the *Gatti Case* and a number of the Louisiana decisions, *supra.*

In the light of such language we may well consider whether or not the mere omission of the defendant to make a full return, whatever the effect, viewed as a waiver of his own right, may be, can prejudice the right of the infant:

to the protection of the court, fetter the conscience of the trial judge or curtail his discretion; whether the applicant who in an equitable proceeding invokes the aid of a court of justice through the exercise of its function as *parens patriae* does not of necessity thus raise the vital question; or, perhaps it would be more accurate to say, whether the law itself, by reason of the ever-present public interest, does not raise the issue on behalf of the helpless child and constitute sufficient notice to petitioner of whatever facts, short of actual surprise, that may be disclosed at the trial.

Whatever may be our final conclusion upon this point, which we freely confess has not been the subject of serious investigation herein, it is not a matter lightly to be disposed of, and we can well afford to make haste slowly in determining how far the general rules of pleading in ordinary actions shall be permitted to control in habeas corpus proceedings before the insular courts. But we need not at this time speculate further along these lines.

It may be conceded that in the case at bar the question of the best interests of the child was not so squarely raised by the pleadings, nor so fully developed at the trial, as could be desired. But it can hardly be said that the question was not before the trial court under the pleadings and the evidence at the time the case was submitted.

Counsel for the plaintiff must have had it in mind in drawing the petition, and counsel for the defendant quietly but deliberately proceeded along the same lines in examining his witnesses so long as no objection was made, although he promptly desisted when the court sustained an objection made for the first time after the more important facts had been elicited. This attitude of counsel for the defendant can be accounted for only on the theory that he shared to a large extent the firm conviction of the trial judge as to the legal effect of previous decisions by this court. The motion of the petitioner at the threshold of the trial to strike

even the laconic return with its simple denials and concise
statement of new matter, on the theory that the defendant
was limited to a showing of some "authority" for the al-
leged illegal restraint, as in the case of a prisoner held
under commitment or other process, although overruled by
the court, was not calculated and did not tend to enlarge
the scope of the investigation on the merits.

The petition alleges among other things:

"5. Neither don Felipe Sánchez Osorio nor his wife is in any way
related, either by blood or collaterally, to the child Nancy Aida
Chabert y Ojeda or to her parents, Augusto de Chabert and Marga-
rita de Ojeda, nor are they tutors or guardians.

"6. That the petitioner has a duly constituted home and sufficient
means to support, rear and educate his daughter, object of the pres-
ent petition, and that both he and his wife are willing and stipulate
to rear, educate and supply their daughter with all necessaries."

The return denies the averment last above quoted and
sets up as new matter:

"That in or about the month of October, 1913, an old woman
called Rosalía delivered to him at his residence in Carolina a child
about one month old in an apparently sick condition, stating that
she did not have sufficient means to supply its necessities and that
she did not know the name of its parents; that the petitioner, moved
to compassion by the condition of the child, took charge of it and
since then has attended to its wants and affectionately reared and
educated it."

Both of these averments might have been amplified by
the enumeration of additional facts, but the tacking on of
a mere conclusion or corollary would not have added ma-
terially to the strength or clearness of either.

The petitioner, in support of his alleged ability to provide
a home for his daughter and to support and educate her,
testified that he is married, lives with his wife, is employed
by the Porto Rican American Tobacco Company at $25 per
week and has two children.

In another connection he also states that he suffers from

filariasis and is often ill, or at least was often ill during the period immediately following the birth of his daughter. An effort is also made to show that for a time while the baby was in the hands of the aged midwife and before coming into the possession of defendant, the father paid from $3 to $5 per week towards its support, although this testimony loses some of its force on cross-examination.

His testimony on direct examination, according to the stenographic record, concludes as follows:

"If the court were to deliver your daughter Nancy Aida Chabert to you, where would you take her?—A. To my home.

"Is the mother of the child living?—A. Yes, sir.

"With whom is the mother living?—A. With me and my other child."

From the testimony of the defendant as set forth in the stenographic record we quote the following:

"What is your profession?—Farmer and merchant.

"Explain how this child came into your possession.—The old midwife turned her over to me because she could not support her, inasmuch as she was from sixty to seventy years old and lived alone and could not attend to the child which nearly died fifteen or twenty days after it was brought from the place where the midwife got it.

     �స     ✸     ✸     ✸     ✸     ✸     ✸

"What did you do with the child?—I delivered it to my wife and as I was making a trip north with my children, I said to her: 'Take care of this child and see that it doesn't die.'

     ✸     ✸     ✸     ✸     ✸     ✸     ✸

"Have you spoken to Mr. Chabert about this matter?—He and his wife called at my home a long time ago and I said 'What can I do for you?' 'I am come to see the child you have here.' 'Here she is.' The child was sleeping. She is a fine and beautiful child. We have given the best possible attention to her rearing since she is entitled to our consideration in view of the sad circumstances under which she came into our custody. We are giving her more attention than our own children receive. They looked at her and said: 'We will return. Come to my house whenever you wish.' They made absolutely no reference to the child's parents.

"How long ago was that?—About six or eight months or thereabouts.

"And since that time have they made any other observations?—He came recently and asked me to give him the child as he wanted to show it to its grandmother. I answered: 'I do not recognize you as its father; you are nobody in this house and I cannot look upon you as the father of this child since your expression itself when you saw the child failed to denote that you were its father; your wife, under like conditions, showed no emotion. Nothing; I wished to see her. We cannot give her to you because of the circumstances surrounding her, you see how she is embracing my wife, you hear her call her *"mamita"* and say "Don't let those people touch me" and we say to you "Don't touch her." '

＊          ＊          ＊          ＊          ＊          ＊          ＊

"What attentions have you paid the child?—I can say frankly that my financial condition has bettered during recent years and we have treated her better than our own children.

"Does she know how to read?—Not yet.

"Do you love the child?—I cannot say more than I do my own children but equally as much.

"Has your wife cared for her?—She has ministered to her with the care that I have just mentioned, with a singular devotion since the child has nearly always been sick and delicate and everything she does is for the child alone since two of my sons have been in the States for about six years and my daughter, who has just completed her eighteenth year, has passed another six years in the Convent College and it was during that time that she was without her children that she took in this little girl and lavished upon her the affection she gave all the rest of her children.

"What is the name of this child who lives with you?—Aida.

"Who are her parents?—I do not know who her parents are.

"Aida what?—We have given her the name of Aida Sánchez Castaño.

"Have you registered her?—We have not registered her because I have been trying to find out who her parents were and hoping that my children would authorize me to give her my name. She has been living under such conditions up to the present."

A curious incident marks the close of the direct examination:

"What are your present resources?

"Petitioner: I object to that evidence as immaterial.

"Judge: I am of the opinion that such point is not in issue and the court sustains the objection."

If by conjecture or by some stretch of the imagination it may be said that the purpose of the objection was to exclude evidence tending to show that the welfare of the child would be promoted by leaving her where she now is, then it came too late. The matters above outlined, constituting the bulk of the defendant's testimony, are for the most part wholly unrelated to the question of paternity or identity, and the general trend and object of the examination are perfectly plain, notwithstanding the amiable acquiescence of counsel in the court's narrow view of the issue involved. If no objection had been made to the question last above quoted and if defendant had been shown to be the owner of a controlling interest in the Guánica Centrale, it would have added but little to the vivid picture already painted by this witness, in striking contrast to the cold statement with which the plaintiff closes his own testimony, *supra,* on direct examination.

We have referred to the foregoing features of the testimony given by the parties themselves, without mention of other more important matters, not for the purpose of showing that the welfare of the child demands that she be left where she is, but as indicating the extent to which this question actually figured in the case as made.

The sixth averment of the complaint and the proof presented by the petitioner thereunder could have had no other end in view than to impress the court with the idea that in the present instance the alleged right of the father does not conflict with the best interests of the child.

The record, as a whole, leaves no room for doubt that if counsel for the respondent had suspected for a moment that this court or the trial judge, under the established precedents, would have permitted a wider range of inquiry, then

a more elaborate and vigorous defense would have been set up in the return and developed at the trial.

But, however this may be, it can hardly be said that the question of the future happiness and well-being of the child is so foreign to the issues as made by the pleadings and the evidence as a whole herein that the same could not have been considered at all by the trial court or cannot be regarded by this tribunal as in any wise involved on appeal.

"The general rule is that the appellate court will consider only such issues as were both raised and relied upon in the lower court. But, where a case has been tried without objection as though the pleadings raised a certain issue, the objection that the issue was not raised by the pleadings, or that the issues were not complete, cannot be made for the first time in the appellate court, and especially is this true where the pleadings, by a reasonable interpretation or fair construction, can be held to present and raise the issue." 3 C. J. 727-29.

"To the general rule that questions not raised below will not be considered on appeal certain exceptions and limitations have been recognized in the various jurisdictions." 3 C. J. 740.

"And it is held that a legal principle, although not suggested by either party at the trial, should be adopted in order to finally dispose of a case on appeal if this impels the speedy enforcement of a right, or redress of a wrong and, as a correct exposition of the law, is appropriate to the facts involved." *Idem,* 741.

"It has also been held that an erroneous judgment may be reversed where the parties proceeded on a mutual mistake of the law, although the only ground relied upon in the court below against the judgment is not sustained." *Idem, idem.*

"Another exception to the general rule that questions not raised in the court below will not be considered on appeal is recognized in the case of questions of public policy or public interest." 3 C. J. 742.

Appellant, save in so far as he may have been misled by former decisions of this court, would have small reason to complain if the court below had based its judgment on findings made under the rule that should have controlled in the

disposition of the case on its merits, or if this court should affirm the judgment appealed from for reasons other than those assigned by the trial judge. And in the circumstances we are at a loss to understand upon what ground the appellant can consistently complain if the case, in the event of a reversal pursuant to his demand, be remanded in order to give him a further opportunity to be heard.

In this connection it is proper to add that, although we might be justified by the facts disclosed upon the face of the record in affirming the judgment appealed from, yet, what we have said, *arguendo,* about these facts is not intended as bearing in any way upon the situation that may arise hereafter. The plaintiff may explain much of what is now unexplained. The mother, who is not a party and did not take the stand, may have something to say, or at least her attitude may be made to appear. The defendant will have had time to consult his children and to determine more definitely upon the prompt execution of his plans for the future of the foster-daughter. The financial situation of the parties may have changed or other more important factors may come into view, relegating the mere matter of money to the background where it belongs. Although a majority of this court feel that the case, as made, would not justify us in awarding the custody of the child to the plaintiff, a minority take the contrary view, and no one of us would hesitate to affirm such a judgment unless a clear abuse of discretion were shown. Upon a full disclosure of such additional facts as may be adduced under the rule announced herein, the father will be entitled to such custody unless a continuance of the *status quo* plainly appears to be more consonant with the future happiness and welfare of the child.

All things considered, we are persuaded that the ends of substantial justice will best be subserved by reversing the judgment appealed from and remanding the case for further

proceedings not inconsistent herewith, rather than by an affirmance upon the record as it stands.

It should be so ordered.

*Reversed and remanded.*

Chief Justice Hernández and Justice Del Toro concurred. Justices Wolf and Aldrey dissented.